THOMAS, Judge.
On May 16, 2011, Barbara Butler went to a store operated by Burlington Coat Factory of Alabama, LLC (“Burlington”), to return some shoes. Butler then decided to shop for some “memory-foam” pillows, *965 which she located in the linens department of the store. The pillows were displayed on moveable metal brackets affixed into a “slat wall” on an “end cap” on one of the aisles in the linens department. Butler was removing the pillows from a set of brackets slightly above her head when the brackets holding the pillows came loose from the wall and fell; one of the brackets hit Butler in the face, causing a lump to form above her left eyebrow. Ultimately, Butler was diagnosed with a nasal fracture and a deviated septum and underwent surgery to correct the injury. She sued Burlington in the Jefferson Circuit Court in December 2011, seeking to establish Burlington’s negligence or wantonness, based on a premises-liability theory. The action proceeded to a jury trial in April 2013, after which the trial court entered a judgment on a jury verdict in favor of Butler on Butler’s negligence claim.[1]
The testimony presented at trial established the following facts. As noted above, Butler was injured when she removed pillows from the brackets upon which the pillows were displayed. Certain facts regarding the incident were sharply disputed, including whether the pillows displayed on the brackets were single pillows in boxes or whether they were a set of two pillows enclosed in a plastic bag.[2] However, whether the pillows were displayed in bags or boxes is not relevant to the resolution of this appeal. Instead, the resolution of this appeal turns on the testimony presented regarding the brackets used by Burlington to display merchandise like the pillows Butler was shopping for on the day of the incident and the inspection procedures utilized by Burlington employees to make certain that the brackets were secure.
Dorothy Baker, the Burlington employee who was responsible for the linens department, testified at length about the use of the brackets in the store. Baker said that she had worked for Burlington since 1993 and that, as part of her employment, she had regularly secured, moved, and inspected the brackets used in the store. In fact, Baker testified that she had installed the brackets that fell and injured Butler, and Baker said that those brackets had been in place for months without incident. She also said that she had visually inspected the linens department, as was her habit on the days she worked, on the morning of the incident between 9 a.m. and 12 p.m. According to Baker, she saw nothing in her visual inspection that day to indicate that the brackets were not secure in the slat wall.
Baker explained how the brackets worked, stating that the hooks on the bracket were placed into the slat wall and that, once the hooks were placed in the slat wall, the bracket was “there to stay.” According to Baker, if she could “see that these hooks are in — the brackets are in the wall there, they’re not coming down.” She said that she did not pull on the brackets after the original installation, explaining that she could visually inspect the brackets to tell if they were properly installed in the slat wall; Baker explained that she did not need to touch the brackets to check their stability. She stated:
*966 “That bracket is not going to be halfway in. It’s not going to be halfway out. It’s either going to be in or it’s going to be on the floor. And if it’s looking crooked, then you need — the only other thing that it could possibly be is that the bracket itself is bent. That’s when you inspect. When it does not look like that it’s in properly, then you can touch and inspect.”
According to Baker, the brackets that fell and injured Butler had never, to her knowledge, fallen off the slat wall before the incident and had not, once they were reattached to the slat wall, fallen off the slat wall after the incident.
Lander Jones, who was the manager of the Burlington store on the date of the incident, testified that the brackets were composed of a lightweight metal. She, like Baker, said that the brackets were either in the slat wall or out of the slat wall. She described the installation and removal of the brackets thusly:
“[Counsel for Butler:] ... If you could just demonstrate for the jury, I think, using this photograph.
“[Jones:] You have to slant it at an angle and clip it up in the wall and then it rests straight down and it rests against the wall itself.
[[Image here]]
“[Jones:] ... [I]t’s going to lock down regardless because once it’s in that slat wall, it goes in and it lays down and it’s either in there or it’s out.
“[Counsel for Butler:] And what causes — or how do you remove the bracket?
“[Jones:] You have to lift it up. You have to dislodge it. You have to lift it up and pull it down.”
Like Baker, Jones explained that “you will know whether a bracket is not in there correctly. You’ll be able to see it. And that particular type of bracket, it’s either in there or it’s not. It’s not going to be halfway in there.” She also testified that one could tell by looking at the bracket whether it was in or out of the slat wall or whether further inspection was needed because the bracket appeared crooked or uneven.
Jones was present on the date of the incident and, in fact, was nearby when the bracket fell and hit Butler. According to Jones, as she approached the end-cap display, she could see the brackets and that they all appeared to be level and secure. Jones said that she saw Butler shopping and that Jones had assisted her in checking a price for a set of two pillows in a plastic bag. Jones said that she stepped into the aisle to check the price of the pillows in the plastic bags; she said that she could see Butler out of the corner of her eye from where she was standing. She said that Butler appeared to be hitting or pushing at the bottom of a box containing a pillow in the end-cap display right before the brackets fell. Based on what she perceived, Jones surmised that Butler’s action in hitting the corner of the box in the display dislodged the bracket, causing it to come out of the slat wall. Jones testified that Butler had said that the bracket had hit her on the head above the left eyebrow, which was consistent with Jones’s having noticed a knot forming above Butler’s left eyebrow. Jones made a report of the incident and offered Butler an over-the-counter pain medication.
Nequette Franklin, who had been employed by Burlington until approximately two weeks before the trial but who had not worked at the Burlington store at the time of the incident, also testified that the brackets, once installed, were “locked.”
“[Counsel for Butler:] ... If you’ll just demonstrate for the jury [with reference to photographs] how these brackets hook into the wall.
*967 “[Franklin:] Yes, exactly. This is a little — These are the prongs. This is the line that the prongs go into, so therefore, when these prongs is hooked, in that part is a little hook, so therefore, when you hook it, it’s locked.
“[Counsel for Butler:] And then how do you take the brackets out?
“[Franklin:] You have to lift it up and unhook it.”
According to Franklin, to dislodge a bracket one had to “hit [it] up, keep hitting it up, and then it comes off the wall” or that “you have to lift it up and keep trying to pop it out”; she said that dislodging the brackets “was hard for [her].” Franklin stated that she had never seen a bracket fall from the slat wall, that she had never been injured by a bracket, and that she had never seen another employee or a customer injured by a bracket. When asked whether a bracket might be “loosened” by a customer “fiddling with merchandise,” Franklin answered: “It would be a little difficult because once again, when you put them in there, they are locked, so they would literally have to bang on them to lift them up.” Like Baker and Jones, Franklin testified that, once a bracket was installed, one could look at it and tell if it was securely in the slat wall.
Butler’s testimony regarding the brackets was that she had not touched the brackets when she removed the pillows. She explained that she “reached to get the pillows to take them out like [she had retrieved similar pillows from] the bottom [bracket], but everything — both of those brackets, they’re supposed to be individually [sic] and they’re locked down. They were not locked down. Those pillows came out with those brackets.” Butler stated that she had not noticed the brackets, that she had not observed whether the brackets were crooked, and that she had no idea why the brackets fell. She denied hitting on the brackets or “popping the pillow from the bottom.” Butler also testified that she was not accusing Burlington of having a “dangerous condition in the store. If there’s one in a million, I was just the one person. If it never happens again, I was the one in a million. I don’t know if it’s dangerous. I was the one person in a million. That’s all that I’m saying.”
Butler testified that the bracket hit her on the head above her left eye. Butler did not request to visit the emergency room that day, but she sought medical attention in the emergency room the following day after having continued pain and difficulty breathing through her nose during the overnight hours. As noted above, Butler was ultimately diagnosed as having suffered a nasal fracture and a deviated septum as a result of the bracket striking her face.
At the close of the all the evidence, Burlington moved for a judgment as a matter of law pursuant to Rule 50, Ala. R. Civ. P. The trial court granted Burlington’s motion as to Butler’s wantonness claim. See supra note 1. Regarding Butler’s negligence claim, Burlington argued that Butler had not presented sufficient evidence of its liability to support submitting the claim to the jury. According to Burlington, Butler had not presented evidence to support the conclusions that the bracket was in a dangerous or defective condition, that Burlington had notice of such a dangerous or defective condition, that the danger presented by the bracket was unknown by or hidden from Butler, that Burlington was negligent, or that Burlington’s negligence caused the harm to Butler. At the heart of Burlington’s argument was the contention that Butler had not presented affirmative evidence that the bracket was defective or that it had fallen as a result of negligence on the part of a Burlington employee. Instead, Burlington *968 argued, Butler was essentially proceeding on the theory of res ipsa loquitur, which is not applicable to establish liability in premises-liability cases.[3] See Ervin v. Excel Props., Inc., 831 So.2d 38, 41 (Ala.Civ.App.2001) (stating the rule that an owner of the premises is not an insurer of the safety of its invitees and that the doctrine of res ipsa loquitur is not applicable to establish liability in a premises-liability case).
The trial court denied Burlington’s motion on Butler’s negligence claim based on a premises-liability theory, and the claim was submitted to the jury. The jury returned a verdict in favor of Butler, awarding her $26,100, and the trial court entered a judgment on that verdict. Burlington renewed its motion for a judgment as a matter of law on the same grounds advanced in its earlier motion; the trial court denied Burlington’s renewed motion. Burlington timely appealed the judgment to this court.
On appeal, Burlington again advances the argument that Butler did not present sufficient evidence of negligence to have warranted submitting the claim to the jury. It argues that Butler failed to present substantial evidence indicating that the brackets were a defective or dangerous condition on its premises and that Butler failed to present substantial evidence indicating that Burlington breached its duty to inspect and maintain its premises in a reasonably safe condition. After much consideration of the testimony and the law applicable to premises liability, we reverse the trial court’s judgment and remand the cause for the entry of a judgment as a matter of law in favor of Burlington.
“ ‘ “[T]he de novo ‘standard by which we review a ruling on a motion for a JML [judgment as a matter of law] is ‘“materially indistinguishable from the standard by which we review a summary judgment.’ ” ”” McGee v. McGee, 91 So.3d 659, 663-64 (Ala.2012) (quoting Glass v. Birmingham Southern R.R., 982 So.2d 504, 506 (Ala.2007), quoting in turn Bailey v. Faulkner, 940 So.2d 247, 249 (Ala.2006)). ‘ “When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue.” ’ Pittman v. United Toll Sys., LLC, 882 So.2d 842, 844 (Ala.2003) (quoting Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997)). ‘ “ ‘Substantial evidence’ is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” ’ Long v. Wade, 980 So.2d 378, 383 (Ala.2007) (quoting Kmart Corp. v. Bassett, 769 So.2d 282, 284 (Ala.2000), quoting in turn West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). ‘Further, this Court has stated that “ ‘[e]vidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence.’ ” ’ State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So.2d 1039, 1041 (Ala.2002) (quoting McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145 (Ala.2001), quoting in turn Brushwitz v. Ezell, 757 So.2d 423, 432 (Ala.2000)).”
Black Warrior Elec. Membership Corp. v. McCarter, 115 So.3d 158, 161-62 (Ala.2012).
“‘[T]he duty owed by the landowner to a person injured on [its] premises because of a condition on the land is de- *969 pendent upon the status of the injured party in relation to the land.’ ” Edwards v. Intergraph Servs. Co., 4 So.3d 495, 500 (Ala.Civ.App.2008) (quoting Christian v. Kenneth Chandler Constr. Co., 658 So.2d 408, 410 (Ala.1995)). In the present case, there is no dispute that Butler was an invitee. Thus,
“ ‘[Burlington] owe[d][its] inviteef, Butler,] the legal duty “to exercise reasonable care and diligence to keep the premises in a reasonably safe condition for the uses contemplated by the invitation, and to warn [Butler] of known dangers, or dangers that ought to have been known, and of which [Butler] was ignorant.” ’ ”
Ervin, 831 So.2d at 41 (quoting Shelton v. Boston Fin., Inc., 638 So.2d 824, 825 (Ala.1994), quoting in turn Lamson & Sessions Bolt Co. v. McCarty, 234 Ala. 60, 62, 173 So. 388, 389 (1937)). However, as our supreme court has explained, “ ‘[t]he owner of a premises ... is not an insurer of the safety of his invitees ... and the principle of res ipsa loquitur is not applicable. There is no presumption of negligence which arises from the mere fact of an injury to an invitee.’ ” Ex parte Harold L. Martin Distrib. Co., 769 So.2d 313, 314 (Ala.2000) (quoting Tice v. Tice, 361 So.2d 1051, 1052 (Ala.1978)); see also Edwards, 4 So.3d at 506 (quoting Shaw v. City of Lipscomb, 380 So.2d 812, 814 (Ala.1980)) (“' “[T]he law doesn’t say that for every injury there is a remedy. It says for every wrong there is a remedy.” ’ ”).
“In [any] premises-liability case, the elements of negligence ‘ “are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages.” ’ ” Ex parte Harold L. Martin Distrib., 769 So.2d at 314 (quoting E.R. Squibb & Sons, Inc. v. Cox, 477 So.2d 963, 969 (Ala.1985), quoting in turn David G. Epstein, Products Liability: Defenses Based on Plaintiff’s Conduct, 1968 Utah L.Rev. 267, 270). More specifically, an invitee seeking to impose liability on a premises owner generally “ ‘must show not only that [she] was injured as a result of a defective condition on the owner’s premises, but also that the owner knew or should have known of the defective condition.’” Miller v. Liberty Park Joint Venture, LLC, 84 So.3d 88, 92 (Ala.Civ.App.2011) (quoting Edwards, 4 So.3d at 502); see also Hale v. Sequoyah Caverns & Campgrounds, Inc., 612 So.2d 1162, 1164 (Ala.1992) (stating that, “[i]n order for [a plaintiff in a premises-liability case] to recover, [he or she] must prove that [his or her] fall resulted from a defect or instrumentality on the premises; that the defect was the result of the defendant’s negligence; and that the defendant had or should have had notice of the defect before the time of the accident”). However, as Butler points out, our supreme court has held that an invitee need not present substantial evidence of the owner’s actual or constructive notice of the defective condition when the defective condition is part of the premises, Mims v. Jack’s Rest., 565 So.2d 609, 610 (Ala.1990), when the premises owner has affirmatively created the defective condition, Wal-Mart Stores, Inc. v. McClinton, 631 So.2d 232, 234 (Ala.1993), or when the premises owner has failed to perform reasonable inspections and maintenance of the premises to discover and repair the defective condition. Norris v. Wal-Mart Stores, Inc., 628 So.2d 475, 478 (Ala.1993).[4]
*970 Burlington first argues that Butler failed to present substantial evidence of the first element of a premises-liability claim — that the brackets were a defective condition on the premises. That “a plaintiff in a premises-liability action must present evidence that the condition of which it complains is defective” is well settled. Miller, 84 So.Sd at 93. The need for such evidence is based on the principle expressed by the trial court in its order in Miller that “ ‘[t]he mere fact that an unfortunate injury occurred[ ] does not give rise to an inference that a dangerous condition existed.’ ” Id. at 92.
The evidence at trial established that the brackets were commonly used by Burlington and had been used without incident for, at a minimum, close to 20 years before the accident giving rise to this litigation. Baker, Jones, and Franklin testified that the brackets were either securely in the slat wall or not on the slat wall. Although some testimony indicated that a bracket could be uneven or crooked, the testimony further indicated that this could occur only when the prongs on the bracket were either bent or broken.
The undisputed evidence regarding the bracket that injured Butler was that the prongs on that bracket were not bent or broken; in fact, the evidence indicated that the brackets that fell were placed back into the slat wall after the accident and that they remained in the slat wall on the date of the trial. Baker and Jones testified that they had each viewed the brackets that had injured Butler on the day of the accident, and, in Jones’s case, her viewing the brackets occurred mere minutes before the accident. Both Baker and Jones testified that the brackets were in the slat wall on the date of the incident and did not appear crooked or misaligned.
Butler argues that, based on the evidence provided by Franklin, Baker, and Jones that brackets that were properly installed were “locked down” and would be securely in the slat wall, the jury could have reasonably inferred that, the brackets that fell and injured her were not properly installed. She also makes much of the fact that, as she puts it, Franklin did not emphatically state that the brackets could not be “loosened” by the actions of a customer “fiddling” with merchandise. Instead, she says, Franklin’s testimony could support the inference that a bracket might become loose during the day and that it would then *971 be precariously hanging in the slat wall waiting to fall. However, Butler misunderstands the nature of an inference.
‘“An “inference” is a reasonable deduction of fact, unknown or unproved, from a fact that is known or proved. See, Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 167 So.2d 274 (1964). “[A]n inference cannot be derived from another inference.” Malone, 277 Ala. at 107, 167 So.2d at 281. An inference must be based on a known or proved fact. Id.’ ”
McCarter, 115 So.3d at 163 (quoting Khirieh v. State Farm Mut. Auto. Ins. Co., 594 So.2d 1220, 1224 (Ala.1992)). The McCarter court was faced with the argument that a jury could have disbelieved testimony that an electric company’s electrical lines were at the proper height based on an early morning inspection and then determined that, instead, the lines were below the proper height and that the electric company therefore had constructive notice that the lines were too low. McCarter, 115 So.3d at 163. Because the plaintiff based its inference of constructive notice on another inference that the lines were low at the time of the early morning inspection, which in turn was based on evidence that the lines were low at the time of the accident, despite the dispute in the evidence regarding whether the lines were low at the time of the early morning inspection, our supreme court explained that the plaintiff had failed to present substantial evidence to support an inference that the electric company had constructive notice. Id. at 163 & 165-66. Instead, the court said, the plaintiff had presented only speculation and conjecture regarding when the lines had become defectively low. Id. at 165-66.
Similarly, in the present case, the facts supported by the testimony of Jones, Baker, and Franklin are that the brackets could not be installed in such a way that the brackets would hang loosely from the slat wall. The testimony established that the brackets were either in the slat wall or they were “on the floor,” except, perhaps, if the prongs on the brackets were bent or broken, in which event, the brackets would hang unevenly. The evidence presented at trial established that the prongs on the bracket that injured Butler were not bent or broken. Even if the jury were to disbelieve the testimony of both Jones and Baker describing the brackets as being properly installed on the date of the accident, the jury had no evidence from which it could infer that the brackets were not properly installed because Butler presented no evidence indicating that the brackets were not properly installed. Butler testified that she had not observed the brackets, looked at the brackets, or noticed the brackets while they were on the slat wall. A jury cannot infer a fact from the lack of evidence, so, even if the testimony of Jones, Baker, and Franklin was disregarded by the jury, the jury would have had to have speculated that the brackets were not properly installed to have determined that they were a defective condition on the premises. “Alabama juries are not permitted to speculate as to the cause of an accident.” Ex parte Harold L. Martin Distrib., 769 So.2d at 315. Thus, we cannot agree that the jury was iree to reject the testimony of Jones, Baker, and Franklin regarding the brackets and their proper installation and then to “infer” that the brackets had been improperly installed.
As noted, Butler also makes much of the testimony provided by Franklin that it would be unlikely, but not impossible, that a customer “fiddling” with merchandise would “loosen” a bracket. However, a reading of Franklin’s testimony does not support the conclusion that a bracket could become “loose” and hang on the wall in such a “loose” condition until it later fell. *972 The questions posed to Franklin on this issue, and her answers, were as follows:
“[Counsel for Butler:] ... Could [the brackets] become loose during the day, though, if a customer was, you know, trying to pop merchandise out of them? Could they loosen during the course of a day?
“[Franklin:] It would be difficult. I mean, I’m not saying that would [sic] happen, but it would be difficult.
[[Image here]]
“[Counsel for Butler:] Would it surprise you during the course of four hours if a customer is fiddling with merchandise, any customer, could those brackets be loosened during that time?
“[Franklin:] It would be a little difficult because, once again, when you put them in there, they are locked, so they would literally have to bang on them to lift them up.
“[Counsel for Butler:] And is the only way they would come unlodged [sic] is if they — I mean, how do they become unlodged [sic]?
“[Franklin:] You have to hit them up, keep hitting it up and then it comes off the wall.”
Although Franklin’s answer to the question about whether the brackets could be “loosened” by a customer might, in isolation, be read in the manner Butler suggests, the whole of Franklin’s testimony, together with the consistent testimony of Jones and Baker, does not support an inference that the brackets could be “loosened” and still hang in the slat wall. The evidence at trial tended to establish that the brackets were either in or out of the slat wall; that if the brackets were not installed properly in the slat wall they would fall to the ground; that, once installed, a bracket could not be dislodged easily; and that dislodging a bracket required that some force be applied to the bracket or that the bracket be lifted. The answer given by Franklin, taken in context, cannot support an inference that a bracket could be properly installed, be loosened by a customer “fiddling with merchandise,” and yet remain partly attached, hanging precariously in the slat wall. Thus, Franklin’s testimony is not sufficient upon which to base an inference that the brackets were a defective condition on the premises.
Butler’s case hinged on the theory that a properly installed bracket should not fall off of the wall and injure a customer. Under well-established premises-liability law, Butler was required to present substantial evidence supporting a conclusion that the brackets were a defective or dangerous condition on Burlington’s premises; however, she presented no evidence indicating that the brackets were defective or dangerous. Instead, she relied on what she contends were inferences the jury could have drawn from the rejection of the testimony of Baker, Jones, and Franklin, who testified about the installation of the brackets. However, the jury had no evidence before it to support an inference that the brackets were defective or dangerous or that they had been improperly installed in the slat wall. All of the evidence presented was to the contrary.
The doctrine of res ipsa loquitur is not applicable in premises-liability actions, and it has been often repeated that the mere fact that an accident occurred does not prove that negligence of the premises owner caused that accident. See Ex parte Harold L. Martin Distrib., 769 So.2d at 314. Because the evidence presented at trial does not support an inference that the brackets or their installation were defective or created a dangerous condition, we agree with Burlington that the trial court erred in denying its motion for a judgment as a matter of law. Accordingly, we reverse the judgment of the trial court, and *973 we remand the cause for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN and DONALDSON, JJ., concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.

. The trial court granted a judgment as a matter of law in favor of Burlington on Butler's wantonness claim.

. Butler said that the pillows were in plastic bags, but Lander Jones, the manager of the Burlington store on the date of the incident, stated that the pillows displayed on the brackets on that date were single pillows in boxes. Another Burlington employee, Dorothy Baker, who was responsible for the linens department, testified that she could not recall whether the pillows displayed on the end cap on the date of the incident were in boxes or in plastic bags.

. Res ipsa loquitur means " 'the thing speaks for itself,' ” and the doctrine "essentially allows a party to prove negligence by using circumstantial evidence.” Carrio v. Denson, 689 So.2d 121, 123 (Ala.Civ.App.1996).

. In Edwards, we indicated only the last two categories as categories of cases in which a showing of notice was not required. Edwards, 4 So.3d at 503. We included Mims in the last category because it appeared that liability in that case was premised upon evidence that the threshold that caused the plaintiffs injury was visibly loose and missing screws, indicating that the premises owner had not inspected and repaired a defect on the premises. However, in Isbell v. Aztecas *970 Mexican Grill, 78 So.3d 420, 425 (Ala.Civ.App.2011), this court reversed a summary judgment entered in favor of the premises owner despite the fact that the plaintiff had failed to present evidence indicating that the premises owner.had actual or constructive notice of a defect in a booth that had resulted in the collapse of the booth and injury to the plaintiff. Our opinion reversing the summary judgment entered in favor of the premises owner relied on the statement in Mims that " ‘once a plaintiff has made a prima facie showing that a defect in a part of the premises has caused an injury, then the question whether the defendant had actual or constructive notice of the defect will go to the jury, regardless of whether the plaintiff makes a prima facie showing that the defendant had or should have had notice of the defect at the time of the accident.’ ” Isbell, 78 So.3dat 424 (quoting Mims, 565 So.2d at 610) (emphasis omitted). Although Isbell appears to render a premises owner potentially liable for any accident resulting from what could be considered a defect in the premises without regard to whether the defect could possibly have been detected by the premises owner, and therefore to run counter to the long-standing principles of premises liability, including the principle that such liability is premised upon the superior knowledge of the premises owner of the conditions on the premises, we note that the opinion in Isbell does not indicate that the premises owner had argued that the booth that had collapsed was not defective. In contrast, as will be explained infra, in the present case Burlington argues that Butler failed to produce substantial evidence indicating that the brackets were defective.